CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
September 30, 2024
LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **RODNEY VANCE FRITH,** ) | |
| Plaintiff, ) | Civil Action No. 7:22cv00389 |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| **KYLE SMITH, M.D.,** ) | By: Robert S. Ballou |
| Defendant. ) | United States District Judge |

Rodney Vance Frith, a Virginia inmate originally proceeding *pro se* and now represented by *pro bono* counsel, has filed a civil rights lawsuit against defendant Smith under 42 U.S.C. § 1983, alleging deliberate indifference to Frith's serious medical needs, resulting in a resection of the third metatarsal of his right foot and an amputation of the third toe on his left foot. Dr. Smith filed a Motion for Summary Judgment, to which Frith responded with a Memorandum in Opposition and a later Affidavit in Opposition. Smith filed a Motion to Strike the Affidavit. The court heard oral arguments on the motions on August 21, 2024, and the matter is now ripe for decision.

Preliminarily, the court will deny the Motion to Strike Frith's affidavit, as the court is able to differentiate between admissible facts within the plaintiff's knowledge, admissible lay opinions, and inadmissible expert opinions. Further, nothing in the affidavit changes the ultimate outcome of the Motion for Summary Judgment, which must be **GRANTED** for the reasons stated herein.

### I. FACTUAL BACKGROUND

Frith arrived at Augusta Correctional Center on January 31, 2020, on transfer from Nottoway Correctional Center. Immediately upon arrival, his medical chart at Augusta noted a history of hypertension and insulin-dependent diabetes requiring chronic care. ECF No. 54-2 at

1.[1]  Several years prior to his arrival at Augusta, Frith had undergone amputation of all metatarsals of his right foot.  At or immediately after his arrival at Augusta, Frith suffered from a blister on the bottom of this foot.  (*See* ECF No. 54-7 at 1, noting January 2020 as onset date.)  Frith also became concerned that his left toe looked infected.  He submitted an offender request, which he labeled "second notice," on February 27, 2020, complaining that his left toe looked infected and that he had a blister on the bottom of his amputated foot that hurt to walk on. On March 3, 2020, a nurse responded that a medical appointment had been scheduled.  ECF No. 83-1 at 1.

Dr. Smith first saw Frith on March 9, 2020.  He observed that Frith had an ingrown toenail on the left and a right foot wound with drainage.  He ordered x-rays of both feet and shoe insoles, referred Frith for custom shoes, prescribed oral antibiotics, and scheduled him for debridement and wound care.  ECF No. 54-7 at 8.  The x-rays were taken on March 17, reporting no significant findings on the right foot, but recommending a bone scan for the left foot.  ECF No. 54-3 at 8–9.  On March 18, Dr. Smith removed Frith's left great toenail and debrided the right foot wound.  ECF No. 54-5 at 13.  He continued Frith on oral antibiotics and ordered laboratory tests and a bone scan.  The bone scan required prior approval from utilization management, which Dr. Smith requested that same day; the procedure was approved on March 19, 2020.  ECF No. 54-7 at 2.

The blood work ordered by Dr. Smith was collected on March 20, 2020, and tested at the lab on March 21.  The results were all within normal levels, and Frith was notified of the results on March 24, 2020.  ECF No. 54-7 at 6–7.  Augusta Health, an outside facility, performed the

---

[1] Dr. Smith filed six sections of medical records with his Motion for Summary Judgment.  They are not in chronological order.  Although Bate-stamped with numbers, not all the numbered pages have been provided.  For easier location of cited medical records, this opinion will refer to the ECF docket number and page number of referenced material.

bone scan on July 9, 2020, with findings consistent with osteomyelitis of left great toe and of the second and third phalanges and midfoot on the right. ECF No. 54-6 at 13–14.

On April 23, 2020, while performing dressing change as follow-up wound care for his right foot, the nurse noted yellow drainage from the wound, which was 4 mm in size. She notified the doctor, and further debridement was scheduled. ECF No. 54-7 at 9. Dr. Smith debrided Frith's wound on May 6, 2020; June 2, 2020; and June 25, 2020. ECF No. 54-5 at 14–15, ECF No. 54-6 at 1. During treatment on June 25, Dr. Smith observed that the drainage had developed a foul odor and that the wound was larger than noted on April 23. Smith started Frith on another course of oral antibiotics, ordered a wound culture, requested approval for referral to a podiatrist, and scheduled Frith for a follow-up visit with Smith in three weeks. On June 30, 2020, Utilization Management approved Smith's requested referral to a podiatrist and added the recommended referral to a wound care specialist. ECF No. 54-7 at 1. The lab results from the June 25 wound culture were reported on July 1, 2020, indicating the significant presence of three different bacteria, including E coli and staphylococcus. In response, Dr. Smith changed Frith's antibiotics from Ciprofloxacin and Clindamycin to Levofloxacin and Rifampin. ECF No. 54-7 at 4–5.

On July 22, 2020, at his follow-up appointment, Dr. Smith noted that Frith had not improved. He arranged transportation for Frith to be seen for an orthopedic consult at VCU, and provided Frith a copy of the bone scan results to take to that appointment. Dr. Smith also ordered additional bloodwork, in which the lab reported abnormal findings on July 24, 2020. ECF No. 54-7 at 3.

Frith arrived at the VCU emergency department on July 29, 2020. Elizabeth Donald, N.P., noted in the History of Present Illness that:

> Per review of records, patient was sent to the ER from Augusta Correctional Center with definitively diagnosed left foot osteomyelitis by 3-phase bone scan. Patient however has healing diabetic foot ulcer to plantar aspect of right foot which he reports has the infection in the bone. He has several trials prolonged oral antibiotic treatment. . . . He reportedly has had osteomyelitis in the past numerous times requiring parental (sic) antibiotic treatment. Per Medical Director of Augusta correctional (sic) Center they report "in my opinion, he needs admission for MRI, ID consult and placement of PICC line." He had a wound culture on 6/25 that showed E coli, Stenotrophomonas maltophilia, and Staphyoccocus (sic) aureus. Labs reviewed and WBC 4.89. Xray with osteomyelitis of left great toe/MTP joint and osteomyelitis of distal right 2nd and 3rd phalanges and midfoot.

ECF No. 1-1 at 2–3.

Later in the day, Dr. Clarence Toney provided an orthopedic consult. He describes the reason for consult as "Right foot osteomyelitis." ECF No. 54-6 at 10. He observed a 0.5 cm scabbed-over ulcer at the plantar aspect of the right foot near the 4th ray and no drainage or purulence. Dr. Toney saw no evidence of osteomyelitis on plain x-rays and concluded that there was no need for urgent surgical intervention. He recommended a follow-up in two weeks and a consult with a wound care specialist. *Id.* at 11–12.

On August 21, 2020, Frith was seen by Andrea White, PA-C, in the Orthopaedic (sic) Department at University of Virginia (U. Va.). She saw no visible evidence of osteomyelitis on that date and performed debridement of a callous near the healing foot ulcer. She ordered an MRI to evaluate for osteomyelitis, continued daily wound care, a pixel shoe to remove pressure from the ulcerated area, and a follow-up with Dr. Perumal to review MRI results. *Id.* at 7–9.

On September 18, 2020, the U. Va. Radiology Department performed an MRI on Frith's right foot, which showed findings "suspicious for early osteomyelitis" at the 3rd metatarsal stump. *Id.* at 6. He met with Dr. Perumal to discuss the results on October 5, 2020, and Dr. Perumal recommended a right 3rd metatarsal resection, or further amputation of the remaining

3rd toe stump. *Id.* at 3–5. On October 7, 2020, Dr. Smith submitted an urgent request for approval of the recommended surgery, which was approved the same day and scheduled for October 20. ECF No. 54-3 at 12.

Frith developed a temperature of 100.6, accompanied by chills and nausea on October 14, 2020. He was transported to the Emergency Department at Augusta Health on October 15. Although still feeling poorly, Frith had no fever during his time at Augusta Health. Noting that he was scheduled for surgery in five days, Dr. Plautz concurred in the diagnosis of chronic ulcer, right foot, with chronic osteomyelitis, and sent him back to the prison with orders to continue his antibiotics and proceed with surgery. ECF No. 54-4 at 1–6.

According to Dr. Smith, Frith's surgery was cancelled on October 20, 2020, because Frith had failed to comply with instructions not to eat or drink after midnight. Smith Aff't, ¶ 24, ECF No. 54-1. Two staff nurses at Augusta Correctional Center advised Frith on November 2, 2020, that he could not eat or drink anything after midnight. ECF No. 54-2 at 2. Frith underwent resection of the 3rd metatarsal on November 3, 2020, at U. Va. Hospital. ECF 54-4 at 7–8. Frith did well post-operatively, being seen by Dr. Smith on November 10 and U.Va. Orthopaedics (sic) on November 18. ECF 54-2 at 3; Smith Aff't, ¶¶ 26–27. On November 23, 2020, after reviewing the report of Frith's November 18 visit and results of wound cultures showing no remaining infection, Dr. Smith discontinued Frith's antibiotics. Smith Aff't, ¶ 27.

Frith's six-week follow-up at U.Va. was postponed because of a COVID outbreak at Augusta Correctional Center. ECF 54-4 at 10. Dr. Smith had a telehealth visit with Frith on December 2, 2020, because of the COVID outbreak, and Frith was doing well. Dr. Smith ordered a walking boot for him at that time. ECF 54-2 at 5. Frith's final post-surgical follow-up at U.Va. was February 1, 2021, at which time he was doing well. *Id.* at 7. His only right foot

complaint thereafter was June 21, 2021, when he complained of general pain in his right foot. Dr. Smith then ordered a new orthotic shower shoe for him. *Id.* at 10.

On March 16, 2021, Frith complained of right knee pain, expressing concern that it could be related to the osteomyelitis. Dr. Smith reassured him that this was unlikely and prescribed over-the-counter medications for arthritis. *Id.* at 8. He also ordered an x-ray of the knee, performed on March 23, 2021, and reported as normal. ECF No. 54-3 at 10.

Frith saw a nurse on April 2, 2021, for a bleeding left toenail that had gotten ripped in half when it got caught in his sock. She noted that his toenails needed to be trimmed, ordered antibiotic cream, and scheduled him for an appointment with Dr. Smith. *Id.* at 6. Dr. Smith saw him on May 13 and prescribed an anti-fungal cream. He saw no sign of "significant" infection and recommended trimming his toenails. ECF 54-2 at 9; Smith Aff't, ¶ 34.

Frith presented with a new injury on July 20, 2021, when he cut his toe on jagged tile while exiting the shower. Dr. Smith observed a puncture wound to his left third toe, which appeared to be infected. He started Frith on a round of oral antibiotics, ordered twice daily dressing changes for 14 days, and referred him for an MRI. ECF 54-2 at 11. At his scheduled follow-up on July 26, Frith's condition was worsening. Dr. Smith sent him immediately to Augusta Health. *Id.* at 12–13. An MRI at Augusta Health confirmed Osteomyelitis in the third toe. Frith was admitted to the hospital and given the option of long-term I.V. antibiotics while staying completely off the foot and receiving regular debridement OR surgery to amputate the third toe. Frith elected to have the surgery, which was performed on July 28, 2021. ECF Nos. 54-4 at 14 and 54-5 at 1–4. His post-operative course was uneventful, and he returned to Augusta Correctional Center on August 2, 2021, where he was seen by Dr. Smith on that date and again on August 11. ECF 54-3, at 1–4. He followed up with the surgeon on August 18,

2021, at which time he was doing well, and his sutures were removed. ECF No. 54-5 at 5–6. On October 7, Dr. Smith signed an order and letter of medical necessity for custom boots and insoles for Frith. *Id.* at 7.

Dr. Smith also referred Frith to a vascular surgeon to be screened for peripheral artery disease, which could be a complicating factor in treating recurrent diabetic foot problems. The vascular surgeon saw Frith on November 19, 2021, at which time he reported that his feet were healing well and that he had "no concerns with ongoing infection." *Id.* at 10. Dr. Shewmake recommended referral to a podiatrist for ongoing monitoring of his feet. *Id.* Dr. Smith requested approval for routine podiatry care for Frith. *Id.* at 12.

## II. Plaintiff's Claims

Frith offers the following allegations in support of his claim for deliberate indifference:

1. He submitted a request for medical attention on February 10, 2020, which received no response.
2. He only saw a nurse on March 9, 2020, and did not see the doctor until March 12.
3. Dr. Smith did not start antibiotics at the first visit.
4. The bone scan ordered on March 18, 2020, was not done until July 9, 2020.
5. The antibiotics Dr. Smith prescribed on March 18 were the "wrong" antibiotics.
6. Dr. Smith performed the wrong type of biopsy on March 18, 2020; when he reviewed the results on May 6, Smith allegedly said "This is not what I ordered," but he did not conduct a correct biopsy.
7. The second course of antibiotics that Dr Smith started on June 25, 2020, the same antibiotics previously prescribed on March 18, were the "wrong" antibiotics.

8. Instead of seeing him one week after the July 9 bone scan, Dr. Smith did not see Frith until July 22, nearly two weeks later.

9. On July 22, 2020, Dr. Smith said Frith needed IV antibiotics, but he was not given IV antibiotics.

10. Dr. Smith did not have Frith follow-up with VCU in two weeks, as Dr. Toney recommended.

11. Dr. Smith did not restart Frith's antibiotics (which Dr. Toney had recommended stopping).

12. Dr. Smith did not order an MRI after U.Va. ordered an MRI on August 21, 2020.

13. Frith's surgery was delayed from October 20 to November 3, 2020, because no one told him he could not eat after midnight before the October 20 surgery.

14. Dr. Smith did not do anything about the osteomyelitis in plaintiff's left foot until July 26, 2021.

15. An echocardiogram performed on March 7, 2022, because of a recently detected heart murmur, revealed aortic valve sclerosis in his heart, which Frith believes to have been caused by a previously undetected SBE (subacute bacterial endocarditis).

Compl., ECF No. 1; Plntf Aff't in Opp to Mot for Summ. J. (hereafter, "Plntf Aff't"), ECF No. 102.

### III. DISCUSSION

A grant of summary judgment is appropriate only if the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The non-moving party must show that there is a genuine dispute of material fact in order to defeat the motion. A disputed fact is material only if evidence of that fact could allow a reasonable factfinder to find for the non-moving party. *Bhattacharya v. Murray*, 93 F.4th 675, 686 (4th Cir. 2024). A party opposing a properly supported summary judgment motion may not rely upon mere allegations but must set forth specific facts, supported by admissible evidence, to show the existence of a genuine dispute of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In evaluating the evidence properly offered, the court must decide if any disputed facts, supported by admissible evidence, could entitle Frith to a favorable verdict on his Eighth Amendment claim for failure to provide adequate medical care.

To support a claim under § 1983 for failure to provide adequate medical care, a plaintiff must present facts that establish deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Such deliberate indifference is required to show the cruel and unusual punishment prohibited by the Eighth Amendment. There are two parts to this test: An objective component, whether the medical need is serious, and a subjective part, whether the defendant had a culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). A culpable state of mind, or deliberate indifference to inmate health and safety, requires that a defendant have actual knowledge of the inmate's serious medical condition *and* actual knowledge that his actions (or inactions) create an excessive risk of harm. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). In other words, deliberate indifference requires evidence that the defendant knew of and ignored an inmate's need for medical care. *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th

9

Cir. 2021). Negligence in diagnosing or treating a condition, i.e., medical malpractice, "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

      Dr. Smith properly acknowledges that Frith's insulin-dependent diabetes and the accompanying risk of complications, including foot ulcers resistant to healing, constitute serious medical needs. Def. Br. Supp. Mot for Summ. J. (hereafter, "Def. Br.") at 13 n.2, ECF No. 54. Dr. Smith was not deliberately indifferent if he responded reasonably to those needs. The remaining issue is whether there are genuine disputes regarding the existence of facts from which a jury could conclude that Dr. Smith was deliberately indifferent, ignoring known serious risks to plaintiff's health. In resolving this issue, the court must look at the admissible evidence, not at the allegations. Accordingly, I will address plaintiff's allegations to determine (1) whether there is evidence to support the allegation and (2) whether such evidence, if it exists, would support a jury finding for the plaintiff.

      Plaintiff may certainly testify that he submitted a request for medical attention on February 10, 2020, to which no one responded, and that he did not see Dr. Smith until March 12, as alleged in his first two allegations. Even accepting both as true, these facts are not sufficient to establish anything against Dr. Smith. Each facility within the Department of Corrections has a system to enable inmates to access health care. Augusta Correctional Center uses "Offender Request" forms. Inmates complete the form and turn it in. Medical requests are routed to the medical unit, where a nurse (R.N.) is assigned to triage the complaint. At least a nurse will see the patient within 72 hours. Medical complaints deemed urgent will be scheduled to see a medical provider within 72 hours; all other requests will be scheduled to see the doctor within two weeks of the nurse's referral. VDOC O.P. 720.1 at p. 7. Nothing indicates that Dr. Smith is

involved in that process of triage and scheduling. Liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Dr. Smith is not liable for the actions of those who process inmate requests and schedule doctor visits, because those actions are not his personal conduct.

What treatment to recommend is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. Whether to start antibiotics on the first visit or second visit and which antibiotics to prescribe are also medical judgments. (*See* allegations 3, 5, 7, and 11). When a doctor makes a medical judgment, even if it turns out to be the wrong choice, that is, at most, medical malpractice, not deliberate indifference. *Id.* Disagreement between an inmate and the doctor regarding the proper course of treatment does not constitute deliberate indifference. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). At any rate, Frith has not offered admissible evidence that the antibiotics initially prescribed by Dr. Smith were not proper. Frith, as a layperson, cannot give an opinion based on specialized knowledge. Fed. R. Evid. 701(c). Nor does Frith have the qualifications to give an expert medical opinion under Fed. R. Evid. 702. Testimony regarding drugs previously prescribed years earlier for a different infection would not be relevant. Because there is no admissible evidence to say that Smith's initial choice of antibiotic was not proper, there is no genuine dispute of material fact on the issue of negligence, much less on deliberate indifference.

The same analysis applies to the "wrong biopsy" allegedly performed on March 18, 2020 (allegation 6). Dr. Smith's Affidavit and notes do not reflect a biopsy on that date but show bloodwork to test for C-reactive protein (CRP) and erythrocyte sedimentation rate (ESR), indicators of infection and inflammation, respectively. Both tests were normal in March 2020. There is no admissible evidence that the tests ordered and treatment rendered by Dr. Smith were

inappropriate, inadequate, or unreasonable in any way, much less that his care amounted to deliberate indifference.  To reach the level of deliberate indifference, when a doctor provides treatment to an inmate, that treatment must be so grossly incompetent or inadequate "as to shock the conscience or to be intolerable to fundamental fairness."  *Hixson*, 1 F.4th at 303 (internal citations omitted).

Frith complains of the delay from Dr. Smith's March 18 order for a bone scan and the July 9 date on which the scan was performed (allegation 4).  While the time between Dr. Frith's order and performance of the bone scan may seem long, average wait times for imaging appointments typically range from 65 to 105 days for most patients, according to some studies.  Y. C. Sun et al., *Simulation and Evaluation of Increased Imaging Service Capacity at the MRI Department Using Reduced Coil-Setting Times*, PLoS One (July 27, 2023). 2023 Jul 27;18(7):e0288546. doi: 10.1371/journal.pone.0288546. PMID: 37498942; PMCID: PMC10374078.  Delays are exacerbated in rural areas, where personnel shortages result in further delays in testing.  Needle.Tube, *Addressing the Shortage of Personnel in Rural Areas: Impact on Point-of-Care Testing and Strategies for Improvement* (2017). https://www.needle.tube/resources-3/addressing-the-shortage-of-personnel-in-rural-areas-impact-on-point-of-care-testing-and-strategies-for-improvement (accessed Sept. 23, 2024).  When the security complications added by the patient being an inmate from a correctional facility are considered, one could reasonably expect the wait to be even longer.  Frith's delay of 113 days is not significantly outside the average wait for patients in the community.  The multiple causes of such delays are beyond Dr. Smith's control, and do not constitute deliberate indifference.

The same scheduling issues arise for MRIs.  Dr. Smith did not "fail to order" an MRI as alleged in allegation 12; the MRI was ordered by U.Va. on August 21, 2020, and was scheduled

12

for September 18, 2020, at U.Va. *See* ECF No. 54-6 at 6. Dr. Smith made sure that Frith was transported to that appointment. This does not show deliberate indifference.

Frith alleges that Dr. Smith failed to see him until two weeks after the bone scan instead of seeing him in one week (allegation 8). Frith fails to consider that Dr. Smith did not receive the bone scan results until July 15, and Smith met with him to discuss those results a week later, on July 22. Smith Aff't, ¶¶ 14–15. Similarly, Frith complains that he did not have a two-week follow-up at VCU after his consultation there. *See* allegation 10. Instead, Frith was seen at U.Va. three weeks after his VCU visit. Both facilities have excellent doctors, and Frith was provided appropriate follow-up care.

Frith complains that he was not given IV antibiotics even though Dr. Smith said he thought that Frith needed IV antibiotics. *See* allegation 9. One reason Dr. Smith arranged Frith's transport to VCU was his concern that Frith needed IV antibiotics, which the prison facility did not have the ability to provide. In the History of Present Illness section of the Emergency Department notes at VCU, Elizabeth Donald, N.P., quoted the Augusta Correction Center Medical Director (i.e., Dr. Smith) as saying, "in my opinion, he needs admission for MRI, ID [infectious disease] consult and placement of PICC line [peripherally inserted central catheter, i.e., an I.V. for use in larger veins]." If Frith did not receive I.V. antibiotics at that time, then the doctors at VCU apparently disagreed with that course of treatment. A prisoner is entitled to reasonable care, not to the treatment of his choice and not to the doctor or specialist of his choice. *Montgomery v. Galarza*, No. 1:20-3689-MGL-SVH, 2021 WL 3520072, at *11–*12 (D.S.C. March 25, 2021).

Frith complains of the delay from October 20 to November 3, 2020, for his right foot surgery, saying that no one told him he could not eat after midnight before the October 20

surgery, and that the nurse making rounds in the pod that evening told him he needed to eat (allegation 13).  Dr. Smith is not liable under § 1983 for the actions of this unnamed nurse, because one is liable under § 1983 only for his own actions.  *Trulock*, 275 F.3d at 402.  The surgeon chose to reschedule the surgery, because food on the stomach increases the risk of regurgitation and surgical complications.  Dr. Smith is not liable for the actions of the surgeon in postponing the surgery, because liability under § 1983 is personal.  *Id.*  Further, postponing the surgery was medically more reasonable than going forward.  Assuming no one told Frith that he could not eat after midnight, the delay was small, and this oversight does not constitute deliberate indifference.

      Frith's most concerning allegation (No. 14) is that Dr. Smith "did not do anything for the osteomyelitis in his left foot" until July 26, 2021.  Plntf Aff't, p.10.  However, Frith had *chronic* osteomyelitis, meaning that infection kept occurring again and again.  Indeed, Frith had osteomyelitis years before he was incarcerated, which resulted in amputation of all his right toes.  In March 2020, Dr. Smith removed Frith's ingrown toenail on the left foot, as well as debriding the wound on the right foot.  Smith prescribed oral antibiotics for treatment of infection.  That medication would treat infection whether it was in the right foot or the left foot or both. The bloodwork in March 2020 did not show signs of an infection then.  After 45 days on the antibiotics, Frith was improved, but trouble with the right foot continued, and by June 25, he was placed on another course of antibiotics.  When the right foot wound culture revealed the presence of E. coli as well as staphylococcus, he was switched to a different antibiotic on July 2.  Again, these antibiotics would treat infection in the whole body, not just the right foot.  After removal of his left great toenail, Frith did not complain about any symptoms in his left foot for a year.

The bone scan on July 9, 2020, previously ordered by Dr. Smith, was "consistent with osteomyelitis of the left *great toe.*" ECF No. 54-6 at 14 (emphasis added). From July 2 until his surgery on November 3, 2020, Frith remained on antibiotics. By November 18, about two weeks after the surgery, lab work indicated no sign of infection, and the antibiotics were finally discontinued. Frith continued doing well throughout the following months with no complaints of any problems until four months later, on March 16, when he complained of right knee pain, which was arthritis, not infection. ECF No. 54-2 at 7–8.

Frith had no complaints of left foot symptoms again until April 2, 2021, when B. Gum, R.N., saw Frith because the "[m]iddle toe on L foot toenail got caught in sock and ripped it half off." ECF No. 54-3 at 6. His left great toenail was also getting caught in the sock, and he was afraid it would also get ripped off. Frith trimmed the great toenail, but the nurse observed that the middle toenail was "ripped halfway off and bleeding." *Id.* She gave him triple antibiotic ointment to apply twice a day for five days and scheduled him to see the doctor because of his high risk of diabetic foot complications. *Id.* Frith missed his appointment with Smith on May 11, but was seen on May 13, 2021. Dr. Smith saw signs of mild athlete's foot (tinea pedis) but no signs of infection; he recommended trimming toenails and provided anti-fungal cream. ECF No. 54-2 at 9; Smith Aff't, ¶ 34.

Although seen in the clinic for other issues between May and July, Frith had no other complaints regarding his left foot until July 20, 2021, when he saw the doctor for an infection in his left middle toe, which started on July 16 after he slipped getting out of the shower and cut the middle toe on a jagged piece of tile. Dr. Smith immediately prescribed oral antibiotics and ordered an MRI and dressing changes twice daily for 14 days. *Id.* at 11. Dr. Smith saw Frith in follow-up on July 26. Because Frith's condition was not improving, Dr. Smith arranged

immediate transportation to the Augusta Health Emergency Department. *Id.* at 12–13. An MRI at Augusta Health confirmed osteomyelitis in the third toe of the left foot. ECF No. 54-4 at 14. Frith was admitted to the hospital, and Dr. Goff provided a surgical consult on July 27. Dr. Goff offered two options: Long-term IV antibiotics and wound care or amputation of the middle toe and a short course of antibiotics. Frith chose to have the toe amputated. The surgery was performed on July 28, 2021. Frith had an uneventful recovery from the surgery.

This timeline shows that Dr. Smith did not ignore problems with Frith's left foot. The infection which led to the amputation appears to have been triggered by the cut he sustained on the middle toe in the shower room on July 16, 2021. Despite prompt treatment with antibiotics, the infection did not improve, and the middle toe had to be amputated. Although this toe was on the left foot, it was not the site of the infection seen in July 2020, his left big toe, which resolved with the earlier treatment protocols.

Plaintiff's final allegation is that Frith failed to order a transesophageal echocardiogram or similar test. Not only is this allegation beyond the scope of the Complaint, but there is no admissible evidence to support the claim. Frith simply speculates that his osteomyelitis caused an undetected SBE (subacute bacterial endocarditis) leading to the aortic valve sclerosis he was diagnosed with in March 2022. He has not offered any medical evidence to support his speculation. Aortic valve sclerosis has many causes, the most common of which is hardening of the arteries and other age-related changes to the heart. Mayo Clinic, *Aortic Valve Disease*, http://mayoclinic.org/diseases-conditions/aortic-valve-disease/symptoms-causes (accessed September 27 2024).

In sum, the alleged disputed facts offered by Frith are either unsupported allegations, not material to the outcome of the case, or both. Frith has failed to show facts sufficient to support a

16

claim for medical negligence, much less that Dr. Smith ignored his medical condition or acted with deliberate indifference. Even within the context of medical malpractice, courts have long recognized that:

> A physician is neither an insurer of diagnosis and treatment nor is the physician held to the highest degree of care known to the profession. The mere fact that the physician has failed to effect a cure . . . does not raise a presumption of negligence.

*Dixon v. Sublett*, 809 S.E.2d 617, 620 (Va. 2018). Sometimes, despite the best medical treatment, diabetics suffer infections that result in amputation.

## IV. Conclusion

For the reasons stated, the defendant's Motion for Summary Judgment (ECF No. 53) will be granted. An appropriate order will be entered this date.

Enter: September 29, 2024

/s/ Robert S. Ballou

Robert S. Ballou
United States District Judge